Thank you Daniel Kachin from Kachin & Lowe on behalf of appellants. I would like to reserve three minutes for rebuttal. May it please the court. Appellants respectfully submit that the district court made three errors that warrant a new trial. The first error concerns the district court's jury instructions on the elements plaintiff's claims. This case was litigated and tried under phase one of the Teamsters framework. Phase one asks a jury to determine whether corporation has a standard operating procedure of discrimination. That is whether a pattern or practice practice of discrimination exists. Intent is inferred from any such showing. The primary evidence is statistical. Well it's very strange but my understanding is that you at various times agree with the proposition that what has to be shown is a pattern or practice of intentional discrimination. But the problem is that the district court divided those pieces up. But at various times you agreed to the because I don't know what it means to say a pattern or practice of discrimination in the sense that under Title 7 there's disparate treatment for which another phrase is potential discrimination. If they had used the word just for treatment I assume you would have objected. And then there's disparate impact. And there isn't just discrimination in the sky. It's not clear what it would mean to have discrimination in the sky. There's still other problems with the instruction perhaps but that can leaving out the word intentional. Is that what you wanted? Judge, the distinction between disparate impact and disparate treatment does, disparate treatment does require intentional discrimination. The difference is that you have to judge outcomes. A corporation intends the outcomes that it achieves. And that's why that is under the radio union case from the Supreme Court. That is why you have to look at the disparities to make a distinction. Sometimes the disparities may be close enough where it's not clear that there is intentional discrimination. But sometimes the disparities are sufficient where the statistics alone can establish a pretty good fact. You think that you want to leave out the word intentional. Is that your claim? Your Honor. Or is it that she should have divided into 1, 2, and 3 and she should have said at the end, made clear that you can infer the intent from these statistics. Your Honor, I think there are two issues. One is, correct, we would like, we think that the word intentional should be struck from the jury instructions. That is one issue. The second problem with the jury instruction is the district court focused on the issue of statistics. And she tied statistics as establishing the element, being used to establish the element of a pattern or practice. Separate and apart from establishing intent. So if we can't use statistics, outcomes that a corporation has, to establish an inference of intent, what in effect the district court was doing was depriving us of the team search framework altogether. Remember, Your Honor, all we're talking about is what is sufficient for us to establish a prima facie case of discrimination. Our statistics, for example, could be rebutted. Perhaps the statistics are wrong. Perhaps there is a legitimate explanation for the statistics. All of that goes into the issue of whether there is intentional discrimination. That is relevant, for sure. But when you divorce the notion of statistics from establishing intent, Hazelwood, Teamsters, Adams, the legacy of cases will change fundamentally in what will be required to prove discrimination would change fundamentally. It would require, for example, direct evidence of intent to discriminate. Your Honor, I would like to direct your case. Well, I mean, the instruction certainly could have been more specific. The question is whether it had to be. I mean, you're certainly right. The statistics can be used to prove the intent. The instruction didn't say it couldn't, it just didn't put it specifically. On the other hand, it said patent or practice, which earlier was defined to be a patent or practice of intentional discrimination. So if you plug that in, you can take her as having the judge or the district court as having said the statistics can be taken to prove a patent or practice of what? Of intentional discrimination. So if you read the whole thing in context, maybe you probably would come to that conclusion, but maybe the jury didn't. So it's more a lack of clarity than an erroneous statement. Is that true? Your Honor, I do not agree with that proposition. And here's why. Consider the Hitchcock case from the Supreme Court. When you say something like a pattern of practice can be proven with statistics, statistics can be used to prove a pattern of practice. Well, actually, didn't she say the element of pattern of practice, which is stronger for your case? Excuse me? She says statistics alone can be sufficient to establish the element of a pattern of practice. Which is a stronger point from your case. I'm sorry, I missed that, Your Honor. It doesn't make your argument stronger. The fact that she said the element and she has defined separate elements. Correct. By necessary implication, jurors do not know, haven't researched the law. They would not be able to readily deduce that statistics not only can improve a pattern of practice, but the statistics can also improve intent. By including that statement, tying statistics just to the issue of a pattern of practice and not tying it to intent in any way, that gutted our Teamsters case altogether. That meant, that put us in a realm where 55 standard deviations is what the statistical disparity is here. We couldn't use that disparity to show intent. We could only use that if a juror is reading these instructions to establish a pattern of practice. Your Honor, consider the Yick Wo vs. Hopkins case. One of my favorite cases in this line of cases. And I'll give you the site. It's 118. In that case, 80 white people petitioned to get a permit to conduct a commercial laundry facility. 79 were approved. On the other hand, 200 Chinese folks, individuals of Chinese descent applied. None of them were approved. No other evidence. That has to be discrimination. Based solely on the statistics. Could you imagine a case, an instance, in which that case required not only those statistics, but it also would require direct evidence of intent to discriminate in order to prevail? And that's, that is one of, this is the debate. Multiple charging conferences with Judge Gonzales-Rogers. She had a different point of view. And she and I debated it vigorously. And I just think that she got it wrong. And so I think, to go back to your initial question, Your Honor, a pattern of practice, if you can prove it, it should give rise to an inference of intentional discrimination. That is what Teamster stands for. That is what Hazelwood stands for. Well, wait a minute. What they stand for is that if you prove a pattern and practice of intentional discrimination, then that transfers to every individual case and in that sense is a presumption. But that's not where we are in this case. We're at the front end. Well, I think your point is a very fair one. It's sufficient to establish a prima facie case of discrimination. That, so we think that that is, was one aspect that's wrong with the jury instructions. And the second one, which is wrong. My understanding is that you several times agreed that the pattern and practice must, quoting from your November 16th conference, your proposal was to proceed on their claims. Plaintiffs must prove a pattern or practice of intentional race and or national origin discrimination. And your complaint is full of allegations of intentional discrimination and practice of employment discrimination. I don't think the use of the term intentional discrimination is the problem here. Well, maybe a problem here, but that's not the problem. Well, your Honor, I mean, the way that the jury instructions were crafted, where there are two separate elements and intentional discrimination is separated out from a pattern or practice such that each has to be proven separately, which is what the district court instructed. And then when you tie the issue of statistics only to the first element, the pattern or practice element, that is legal error. And that was prejudicial to us. That, that took away, essentially took us out of the Teamsters framework. And by necessary implication, what it meant is that we needed to show direct evidence of discrimination to prevail on our phase one claim. And we don't think that there's any case in this line of cases that would support that proposition. So are you contending that this, this, the spin that you put on this is what was argued to the jury? That is, need to prove intent? Your Honor. Yes. And in Tata's closing, they absolutely focused on the fact that the discrimination here not only didn't have to be a pattern or practice, it had to be purposeful. And so both have to be purposeful, but it can be proved. You can prove that through the statistics that establish a pattern of practice, but it does ultimately the conclusion that there is intentional discrimination. So the question is, did they, is that wrong? That is, you could not have been more right. That's exactly it. That is what Teamster stands for. All right. So my question is, did they argue, or I understood Judge Schroeder to be asking, did they argue that in addition to statistics, you could not infer the pattern, the intentional discrimination, a pattern of practice of intentional discrimination from statistics. You had needed a pattern of practice and you also needed separate evidence of intentional discrimination. Yes, Your Honor. I would direct you to our briefing where we discussed what they emphasized in closing. And for a number of ways, it kind of whipsawed us in closing, but that was one of them where they said it has to be purposeful. The discrimination here… It doesn't have to be purposeful. Excuse me? It was very subtle, but it does have to be purposeful. It just doesn't have to be, you know, judges don't have to prove that with anything but the statistics. Right. A corporation must intend the outcomes that it achieves. Yickwell versus Hawkins. Think about that. Those outcomes had to have been intended. And the way that you show intent, the way you show purpose, is you look at outcomes. That's… Why do otherwise? So the question is, did they argue otherwise? Did they argue that proving statistics from which you could infer a pattern and practice of intentional discrimination wasn't enough? They argued that in addition to statistics, in addition to that, we had to show purposeful discrimination. What they said, one thing they said was that in order for plaintiffs to prevail, they must prove that TCS's standard operating procedure was to intentionally discriminate against non-South Asians and non-Indians. Now, is that… Is that arguing… Is that argument not according to law, according to you? Your Honor, the… I will… In my rebuttal, I will direct you to this point and to the record side. What we argue, or they argue, that the intent, the discrimination here has to be purposeful. And that… Their argument is following the letter of the law as instructed by the court. And that, you know, based on these jury instructions… Is that incorrect? Yes. Incorrect, but why? Because the intent, when statistics, the outcomes achieved are not tied to the issue of intent, and then you are held to a standard where you have to prove purposeful conduct separate from the outcomes. That is the question. Where is the separate from coming from? It is accurate to say that the ultimate bottom line has to be that there was purposeful discrimination or intentional discrimination or, as Judge Schroeder said, that discrimination was the modus operandi or whatever the language is. That's accurate. What isn't accurate is any implication that you need more than statistics to prove it. What's not accurate is when you can't use the outcomes as determined by the statistics to prove the discrimination. That is where it… Prove purposeful or intentional discrimination. Excuse me? Prove purposeful or intentional discrimination. Right. When the issue of statistics is divorced from the issue of intent, what you are doing then is you're outside of the team search framework altogether. You're in direct evidence of discrimination land, and that is… That would do away with this line of cases. Think about Yequil v. Hopkins. It's a great case to illustrate the point. How can that ever be anything but intentional discrimination based on those outcomes alone? And if you look at the jury instructions and you have to put yourself in the jurors' frame of mind, they're looking at this as the law. And when they say that the… They read that if you find plans of proof, each element referenced above in a pattern of practice is element one and element two of intentionally discriminating. And then they see that statistics alone can be sufficient to establish the element of a pattern of practice. What that means to a juror is statistics is good for element one. Let's see what the plaintiffs have with respect to element two. And that's where Tata argued it has to be purposeful. And when you look at these jury instructions and you understand why Tata is emphasizing that in their argument to the jury, it's how they're going to win the case. If they're taking the issue of statistics and separate it from the issue of intent. Thank you, counsel. You're out of time. Oh, okay. I will… We'll give you a couple of minutes for rebuttal, but you ran over your time. Our questions took you over time. All right. We'll hear from Ms. Hepler. Good afternoon, your honors, and may it please the court. Laurie Hepler for Tata Consultancy Services Limited. Your honors, there was no divorce here. The word of between elements one and two inextricably linked them because neither a pattern nor a practice has any meaning without of. It's like saying you… Then what was the purpose for saying there are separate elements? Aha. So… It's very confusing to somebody who isn't steeped in this rather arcane and difficult law that if you tell them you have to prove number one and number two and number three, and then you tell them, and these are separate elements, and then later you tell them that you can prove element one with statistics, but you don't tell them that you can prove element two with statistics, which you undoubtedly can. Do you agree with that? Oh, sure. But, your honor, I disagree that the court told the jury or even implied that they couldn't use statistics to prove the intentional discrimination. I don't think you can read… Well, first she said there are three elements. One is pattern or practice, and the second is intentional discrimination. And then she said you can use statistics to prove… But, your honor, your honor, they may have appeared on separate lines, but there's simply no way to read them as being entirely distinct. The slight distinction achieved by putting them on separate lines was driven by Teamsters and by Hazelwood. It was very important to make sure that the judge conveyed to the jury that they had discretion to draw or not draw the inference of discriminatory intent from pattern or practice evidence. And so her approach captured the law as set forth in Teamsters. But she didn't tell them that. Oh, sure she did. Later down on the same page, in fact, she told them in two different ways. First of all, the definition of pattern or practice refers to discrimination. That's the only pattern or practice before the jury. So there's truly no way, grammatically or otherwise, to look at Line 1 as distinct from Line 2 when you define Line 1 by reference to Line 2. That's the first way in which the court made clear to the jury that these were connected. The second way is that toward the end, as I think my friend Mr. Kotchin has acknowledged, the court directly instructed the jury, and I'm reading now, in deciding whether plaintiffs have proved their claim by a preponderance of the evidence, you may consider direct and or circumstantial evidence to prove each element of the claim. And of course, statistics are circumstantial evidence. The jury was expressly invited to use any form of evidence to prove any element. I can't even say it's an argument that a law professor would love because it just doesn't hold water when you read these as a whole. Counsel, I'm sorry, but I'm having trouble following this. As I read, it seems to me, the first part of this instruction, it says, to succeed on these claims, plaintiffs must prove by a preponderance of the evidence that TCS had, one, a pattern or practice, two, of intentionally discriminating on the basis of race against non-South Asian employees. That, to me, is capable of the interpretation that they must show that each one of those incidents that makes up the pattern and practice was intentional. And that is not the law. Now, where in this instruction is the jury told that it's not supposed to read it that way? Your Honor, if you took the of out of line two, it's perhaps more arguable that they had to be read distinctly. But because the of is there, and because line one simply has no English meaning to a lay juror without an of, it is absolutely compelled to any lay reader to read them together. They are not distinct. The judge separated those two only in order to convey to the jury, the law under Teamsters, that a pattern and practice is not necessarily discrimination. And that is the crux of this case. The plaintiffs wanted the jury to accept that their statistics were, per force, automatically discrimination. And Mr. Kachin argued for that rather relentlessly, saying that intentional discrimination is inferred, meaning always inferred or must be inferred. And the judge correctly resisted that. Your defense was largely that these statistics don't mean what they say they mean. Well, among other things, yes. Yes. What else? Oh, gosh. Your Honor, our defense consisted of, I would call it, three distinct pillars. One was destroying, if I may, the plaintiff's expert's evidence, and the court's order denying new trial, which the reply brief admits is not on appeal, detailed, and our brief detailed, the ways in which their statistical evidence fell apart at trial. I asked what else. Okay. So that's piece one. Piece two is that, although we believe the burden never shifted to us because their evidence was so weak, TCS came forward with affirmative evidence in two key respects to explain the statistics as Teamsters allowed us to do, and as Hazelwood requires a circuit court. Then what else? I'm sorry, Judge, I didn't hear you. Still the statistics. Then what else? Okay. So we explained that the statistics don't mean what they say for the following reasons. I understand that. Okay. And then the third, so to speak, large bucket of evidence was, frankly, a tidal wave of affirmative evidence that TCS did not discriminate. And that fell into, I would call it, three general categories. First was direct evidence of nondiscrimination, which I can itemize for your honors. Second was the evidence suggesting discrimination would be unlikely or implausible. And that the judge commented on after the verdict, saying that the plaintiffs never explained the sheer implausibility of TCS letting- The problem with that is that, for the most part, discrimination is implausible. Always, pretty much, because if you have qualified people, why shouldn't you hire them? The premise behind Title VII is that there essentially are irrational forces at stake. Your Honor, here's why I don't think that works here. Yes, you're right, as to individual situations. Yes, an employer might not even notice how bad for business it is to terminate or fail to promote the most qualified candidates. But that breaks down at the scale that plaintiffs were alleging here. They posited that TCS let 5,000 positions go vacant every day for lack of qualified employees. Forgoing untold millions of dollars in revenue in order to aim for racial purity. That is truly implausible, Your Honor, in a way that individual one-off discrimination cases cannot explain. The judge who sat in a ringside seat for all of this sat back after the verdict and said, you know, it just didn't hold together. That one among many rational bases for the jury's verdict- So is this a species of a harmless argument? That is, even if there was something where the instructions were less than- Well, yes, among others, Your Honor. And I don't want to lose sight of the fact that while Mr. Kachin indicated he had this argument at length with the judge, the only instructions they object to in their briefs were circulated on November 24th, and he was not even present for the charge conferences on the 26th, at which plaintiffs' counsel affirmatively approved these instructions. But they had already objected at some length to the concepts included. And the judge said, with some annoyance, that she didn't want to hear people repeat what they had already said, and they were preserving all their objections. No, she didn't say that, if I may, Your Honor. Her comment indicated that she didn't want to hear any more about proposed instructions that she had rejected. In no way, shape, or form did she excuse the plaintiffs or anyone from objecting to the form of her instructions, which they were required to do under Rule 51 at the November 26th conference, because her instructions didn't exist before then. They simply didn't exist. And in fact, they didn't really resemble anything that the parties had discussed before then. What we debated on the 26th, and I was there arguing at all of those three conferences on that date, were a set drafted by the district court and circulated two days earlier that did not sufficiently resemble anything discussed before to excuse the plaintiff, not only from not objecting then on the grounds they do now, but affirmatively assuring the district judge that her instructions were clear and acceptable. I don't see how a waiver can exist if not under these circumstances. That is a knowing and affirmative waiver, Your Honors. This court should not review these instruction arguments. Can I ask briefly about the main evidence issue? I'm sorry, I didn't hear you, Your Honor. About the evidence issue. Your opponent is not arguing, but about the exclusion of emails that appear to be of hiring. I guess there are two questions. One is, as I understand it, but I'm not sure I do understand it, there is a necessary intersection between who was being hired and whether people were being terminated, or how many people were being hired and whether people were being terminated, in the sense that if there was an open slot and there was an already employed person on the bench, but the company, for example, asked for a desi, and so your recruiter went out to look for a desi instead of the person on the bench, that would lead to the termination in the long run of the person on the bench. Now, is that not how the system works? Why is there not a necessary interconnection between the hiring issue and the termination issue, given the way the company is organized? Okay, so first, that isn't how the system works. I think both briefs acknowledge that the current TCS employees were never in direct competition with external hires with the same roles. The opening brief explained that TCS only looked outside the company after presenting all existing employees, including those on the bench, to a project manager, and our brief explained the same process. But that would mean that if the project manager said, I only want a desi, then they would go outside and hire a desi. Okay, so, Your Honor, I want to get realistic about the claimed relevance of this evidence,  setting aside that plaintiffs never presented these specific emails to the court to rule on admissibility, and did not have a single witness who could have overcome a hearsay objection. They did not have a sponsor. Setting all that aside, they now point to these seven emails between line-level project managers and a former employee whose job was external hiring to prove discrimination by TCS as a company. Now, TCS had 36,000 employees in the United States, who, if they sent one email per workday, would total over 50 million during the class period. Plaintiff's argument is like looking at six years' worth of student text messages on a huge university campus, finding seven about a preference for Indians in a study group, and offering them as evidence that the university administration intentionally fired non-Indians. All right? That is the minuscule relevance that we're talking about. And only the most accurate... What we're doing is making a 403 argument. Did the district court rule on 403? I think that under Enquist and McEwen, this court should read the record. The most logical reading of it, just as in those cases, is yes, the district court was ruling under Rule 403. The district court repeatedly commented on the volume of evidence before her on this specific motion, the volume of evidence submitted by both sides. Those are all cited in our brief. The ruling granted a motion that emphasized delay over more than pure irrelevance, and the court expressed concern both at the preliminary hearing and in the order denying new trial about streamlining an utterly, for all the court knew at that time, a multi-phase class action that was supposed to be devoted to termination. So yes, Your Honor, I think this is a straight abusive discretion review, if the court reviews this at all, because again, the plaintiffs should have brought these emails to the court's attention for a specific ruling, and they never, ever did. Counsel, let me ask you a question. I'm looking at the closing argument here, and let me read part of it for you. This is in discussing Dr. Newmark's testimony, and he said, the first thing I want to point out to you, though, is Dr. Newmark, about Dr. Newmark, is that he did not opine on a very critical element of plaintiff's claim, and that is the intent to discriminate. So, doesn't that lend some credence to the argument that, in fact, an argument was made to the jury that statistics couldn't be used to show an intentional act of discrimination? I don't think so, Your Honor, for the following reason. I think that Dr. Newmark himself repeatedly said during his, in fact, I know he did, repeatedly said during his testimony, I am not opining on intent. I am only telling you, ladies and gentlemen of the jury, that these statistics are consistent with, quote, unquote, consistent with an intent. So, I don't think, Your Honor, that that element of the closing did anything more than echo what the expert himself said more than once. I'll look at the testimony. Sure. Your argument is that, in context, he was just talking, he was talking about the actual testimony. Correct. And not the notion that you can't prove. Correct. More generally, did you, in fact, argue anywhere in the closing argument that statistics, aside from attacking statistics, that something more than just statistics were necessary? No, Your Honor, the closing focus, and I hope that you'll bear with me here, because I want to answer your question exactly how it went down at trial. The closing focused on the utter unreliability of the statistical evidence. So, no, and I don't think the closing suggested to the jury that statistics wouldn't be enough under the law. What the closing said was that these statistics aren't enough. And it's quite evident that, from the order denying new trial, that the judge believed there was, there were many grounds on which the jury could have agreed with that argument. And I emphasize again that that order has not been appealed and provides you with an overview, in addition to all the citations in our brief. So, I see them over my time, but if you'll indulge me, finally, I think that there is no prejudice from any claimed error that you choose to review, because, as in U.S. v. Carpenter, there was such a mountain of evidence, and I am quoting that from U.S. v. Carpenter, such a mountain of evidence on which the verdict could have rested, and such a disastrous set of testimony by the plaintiffs and, frankly, their expert, that the result would have been the same, even if any of these errors had any traction. Thank you, Your Honors. Yeah, thank you, Counsel. And we'll give you three minutes for about roughly utilizing the time. Thank you, Judge. I'll be as quick as possible. First thing, I promised you I'd find you the citations to Tata arguing in closing about the relevance of purpose. If you look at page 39 of our opening brief, in the middle of the page, we have a paragraph discussing Tata's argument. And here's what Tata's attorney said. And the discrimination must also be intentional, which means it must be purposeful, okay? So in order for plaintiffs to prevail, they must prove that Tata's standard operating procedure was to intentionally discriminate. So what he did is he— Is there something wrong with him? Yes. He's harping on the added element that intentional discrimination must be— And so that is—one of the ways that the jury instruct— Well, let me ask you something. If instead of using the word intentional, the district court had said disparate treatment, would you be complaining? Judge— The standard practice of disparate treatment. We would complain as long as statistics are divorced from whether it's disparate treatment or intentional discrimination. As long as that connection is not made, we don't think that the instructions are legally valid. And Ms. Helper talked about Dr. Niemark's testimony and analysis. We'll have to agree to disagree. Tata's expert didn't refute his numbers, the 55 standard deviations. They took another tack that we think was irrelevant, quite frankly, to whether or not there was a disparate treatment between non-South Asians and South Asians. In any event, that's—the primary purpose with respect to this is the jury instructions and how statistics are separated from the issue of proving intentional discrimination. That's what Teamsters, Hazelwood, and his progeny stands for. Quickly, Your Honor, I'd like to get to the issue of the desk emails. We do not agree with Ms. Hepler's rendition of what the parties agree or disagree with. The project managers were, of course, looking at local hires to replace while non-Indians were sitting on the bench without work. And we think that the emails show, just as Your Honor suggested, an animus towards the protective class that under this court's confluence— They were seven emails and essentially one person. They were seven email chains. And just essentially on a four-on-three basis. They seem to me to be relevant. But the question is, were they so minimally relevant that it was okay? Judge, Tata is ignoring the practicalities of class-action litigation. We have a grand total of 15 custodians from whom we can seek documents and discovery. Fifteen. This is a set of seven email exchanges. It's a series of emails involving a whole host of folks. As just Ms. Hepler discussed, they involve the line project managers. It's not one person. It's a group of folks, all of whom are looking and, we think, engaging in discrimination. It's anecdotal evidence. And if this type of evidence can't be proven to show intentional discrimination, then we think that the discussion at Teamsters about using anecdotal evidence to bring the cold, hard numbers convincing to life means nothing. This is exactly what Justice Stewart was intending when he wrote that in the Teamsters decision. What was the district court's basis for this? Judge, our best reading is she thought it was irrelevant hiring evidence. In the motion and lemonade proceeding, they were pitched as inflammatory hiring emails that are irrelevant. Am I correct, counsel, that this whole action had been kind of divided into two, one the termination and one the hiring, into this termination part? Judge, the district judge had bifurcated an individual hiring plaintiff from this termination class, yes. And so the hiring case for this one individual, Mr. Buchanan, was proceeding on a separate course, and this was just the terminations. With that said, there is an absolute overlap between the project managers. They're the ones who are deciding who to staff in open positions. The project managers are. If there is a non-Indian relegated to the bench without work, that project manager then is looking at that person to see if that person should be staffed to an open position. What these emails show is that the project managers, the very people who are charged with staffing the positions, are going outside the organization to look for desis, individuals of Indian descent, to staff in open positions at the very same time that non-Indians are sitting on the bench and then being fired. And so, on Ms. Hepler's point that they would have no economic motivation to discriminate, they are firing people. And when they fire people, it just so happens that the very people that they're firing happen to fall within the race and national origin category that are not preferred. When they make that decision who to fire, they are choosing the non-Indians, the non-South Asians. The other major thing they say, and you are of your time, but I'm curious, that the so-called expats weren't fired in the United States. They had to be sent back to India before they could be fired. And I don't believe that's a function of federal law, although I'm not sure. What is the representation there? What's her position on it? Your Honor, Dr. Niemark's analysis incorporated everyone who worked in the U.S. that was terminated. Whether it's expats terminated in the U.S. and there were some, or if it's expats that went back to India before they were terminated. And I will refer you to the very specific record sites so you can look and see how his analysis included that. So terminations, for example, that occurred in India, that's being part of his analysis. You can look at ER, the record, 53 to 54, at testimony pages 100 to 101, ER 482, an exhibit, and ER 505. For the notion that expats were also terminated in the U.S. just on a very infrequent basis, I would direct you to ER 159 at 1221 to 22, ER 482, and ER 505. You will see in Dr. Niemark's analysis that of the expats who had to go back to India and were terminated, there are a grand total of three, three terminated from the bench. Meanwhile, for a severe minority of folks, the non-South Asian, non-Indians in the U.S., there was on the order of 1,700 terminated from the bench during the class period. That is an outcome that couldn't be more spot on to Yick Wovis Hopkins. We looked, and we couldn't find another outcome that's as striking as that except for in Yick Wovis. Actually, one of the Title VII cases I think was Teamsters talks about the NX000 and how the NX000 is sufficient. You can stay a little closer to the present for similar things. Judge, and Counsel, you are over your time. I will stop. Thank you. I appreciate your time and effort. Thank you both for your arguments. Very helpful to the court, both of you. The case to serve you will be submitted for decision, and we'll proceed to the last case on this afternoon's oral argument calendar. Thank you, Judge. Thank you.
judges: Schroeder, Thomas, Berzon